53 CCPA

**Application of Victor A. J. VAN LINT and Park H. Miller, Jr.**

**Patent Appeal No. 7525.**

United States Court of Customs and Patent Appeals.

Jan. 13, 1966.

Robert K. Schumacher, Chicago, Ill., for appellants.

Clarence W. Moore, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

MARTIN, Judge.

Appellants appeal from the decision of the Board of Appeals affirming the examiner's rejection, as obvious over the prior art, of claims 2 and 4 through 10 of their application, serial No. 687,806, filed October 2, 1957, for Information Storage Device. No claims are allowed.

The invention relates to an information storage device which utilizes the property of superconductivity possessed by certain metals and alloys. The application points out that at low temperatures approaching absolute zero (0 degrees Kelvin), such materials go through a transition into a superconducting state in which the electrical resistance has a value approaching zero, thereby becoming perfect or nearly perfect electrical conductors. That change, from the normal to the superconducting state, is reversible and takes place at a critical temperature which depends upon the material and the magnetic field intensity to which it is exposed. Superconducting material is described as "generally an effective electromagnetic shield." However, the application of a magnetic field exceeding a certain critical strength will destroy the conductivity of a material and eliminate the shielding effect.

Appellants further state:

* * * We have now discovered that a thin superconducting film having a magnetic field producing means such as a length of wire conductor or an exciting coil on one side and a signal pickup means such as a coil on the other side when constructed as hereinafter set forth, may be utilized as a bi-stable storage or memory device. The adaptability of such a structure as a memory device may be demonstrated by applying positive and negative current pulses to the excitation means and observing the current pulses induced in the pickup means. For example, in a device having an exciting coil and a pickup coil, if very small current pulses are applied to an exciting coil, no current pulses or signals are induced in the pickup. This phenomenon is expected, since a superconducting film is generally an effective electromagnetic shield. As the exciting current is increased, current pulses begin to be induced in the pickup coil. These pulses are apparently due to increments of magnetic flux which penetrate the film and induce currents in the pickup coil. If a signal pulse is applied to the exciting coil and then turned off, only a singled [sic] pulse of like polarity is observed in the pickup coil. The flux which was forced through the film apparently remains there as permanent magnetization. If a series of input pulses of one polarity are applied to the exciting coil, it will be observed that only the first pulse produces a signal in the pickup coil. If the polarity of the input pulses is reversed, only the first pulse of opposite polarity pro-

**676**

duces a signal in the pickup coil. This may be explained by a reversal in the direction of the magnetic field which is frozen in the superconducting film. If sufficiently large exciting currents are used, only part of the flux remains frozen into the film. The first exciting pulse of a given polarity will in this case produce a large pulse of like polarity associated with the flux change, followed by a smaller signal of opposite polarity due to the return of part of the flux from the film. Subsequent pulses of like polarity will then produce like and opposite polarity signals of the same magnitude as the initial smaller return signal.

A device of this type may be used as a bi-stable memory device since the film remembers the polarity of a previously existing current pulse by retaining a residual magnetization of that polarity. The information can be read out by applying another pulse to the exciting coil and observing whether a signal appears in the pickup coil.

In the specific device appellants disclose, a thin film of superconducting material less than 3000 Ångström units [1] thick is formed, as by vacuum deposition, on a supporting plate of insulating material, a flat spirally wound exciting coil is located on one side of the film, and an axially wound cylindrical pickup coil is located on the other side of the plate in general alignment with the exciting coil. A preferred embodiment utilizes a film of lead kept in the superconductive state by immersion of the device in liquid helium, which has a temperature of about 4.2 degrees Kelvin, about three degrees below the critical transition temperature (for superconductivity) of lead.

Concerning the exciting or excitation coil, appellants state:

\* \* \* An excitation coil which produces a flux density of one gauss or less in free space is generally sufficient to penetrate the superconducting film of the present device. This is considerably smaller than the value of the field required to completely destroy the superconductivity of the film.

They further disclose that the current pulse passed through that coil to produce the desired magnetic field may be "about a value of 0.1 ampere."

Claim 10, accepted as illustrative by both the appellants and the board, reads:

10. An information storage device comprising a thin film of superconducting material having a thickness less than 3,000 Ångström units, excitation means adjacent one side of said film, means for coupling said excitation means to a source of current pulses, said excitation means being operable in response to the flow of current pulses therethrough to form a magnetic field with components of lines of flux extending normal to the plane of said film and of a strength less than that necessary to destroy the superconductivity of the film but greater than that necessary to cause lines of flux to penetrate through said film, and pickup means fixedly disposed adjacent the other side of said film for detecting changes in the lines of flux which penetrate through said superconducting film, said film extending beyond said pickup means a sufficient distance to shield said pickup means from lines of flux other than those penetrating through said film.

The other appealed claims are somewhat more specific. Among the additional limitations found in those claims are recitations that the film is a lead film of a thickness between about 50 and 200 Ångström units, that the exciting coil is no more than .010 of an inch from the film, and that the current pulses are about 0.1 ampere or less.

The claims stand rejected as defining subject matter obvious to one of ordinary

---

1. An Ångström is $10^{-10}$ meter.

skill in the art in view of the following publication:

Hewlett, "Superconductivity," General Electric Review, Vol. 49, No. 6, June 1946, pages 19 to 25.

Reference was also made by the board to:

Standard Handbook for Electrical Engineers, McGraw Hill Book Company, Inc., 1915, page 186.

The Hewlett article provides a general discussion of the phenomenon of superconductivity. It tabulates the elements which can be made superconductive and also states that many alloys and metallic compounds are superconducting at low temperatures. A discussion of the relationships that the temperature of the materials and the magnetic field to which they are exposed bear to superconductivity is included. The article points out that, upon exposure of a metal in a superconductive state to a gradually increasing magnetic field, a field strength will finally be reached at which resistance suddenly reappears. The magnetic field strength that thus brings the resistance back to its normal state for a given temperature, is defined by the article as the "threshold field" and denoted by $H_T$. It is stated that such "threshold field" becomes greater as the temperature of the superconducting metal is lowered.

Hewlett also describes investigations of magnetic field effects in connection with both hollow and solid cylinders of superconducting tin. In the case of the hollow cylinder, a magnetic field was applied transversely to a plane through its axis while the solid cylinder was subjected to an external magnetic field in the direction of the cylinder axis. The distribution of the magnetic field intensity around the cylinders was measured with a test coil.

The Standard Handbook for Electrical Engineers citation illustrates ballistic methods for making magnetic permeability and hysteresis determinations. In those methods, the magnetic flux is measured with a ballistic galvanometer connected to a stationary test coil which is cut by the magnetic field or flux upon reversal of the exciting current through a coil associated with the same core material as the test coil. The phenomenon of superconductivity is not involved.

In holding that the claimed subject matter would be obvious to a person of ordinary skill in the art in view of the Hewlett article, the examiner treated appellants' device as having the purpose of determining whether the film of material capable of superconductivity is or is not in a superconducting state. He relied particularly on the description of the investigation involving the hollow cylinder of superconducting tin, noting that the tests involved means for providing a magnetic field, a material capable of superconductivity and a test coil, and stating that the results demonstrated that a magnetic field does not penetrate superconducting material. He also noted the disclosure in Hewlett that imposition of a gradually increasing magnetic field on metal in a superconducting state will result in a field strength being reached which will destroy the superconductivity.

The examiner also considered contentions by appellants that Hewlett does not disclose a thin film of less than 3000 Ångström units thickness, a magnetic field with lines of flux normal to the plane of the film, extension of the superconducting material beyond the pickup coil to shield the coil from magnetic lines of flux other than those penetrating the material, and a fixed or stationary pickup coil. However, he regarded those features as obvious to a person of ordinary skill in the art.

It is plain that the examiner gave no weight to the designation of the device as an information storage device in the preamble of the claims. Also, he did not discuss the recitation that the applied magnetic field is of a strength less than that necessary to destroy the superconductivity of the film.

In affirming the examiner, the board referred to the subject matter as a memory device capable of storing information connoted by either of its bi-stable states, thus avoiding adoption of the examiner's reference to the purpose of the device as

determining whether the film is super-conducting or not. It also referred to a portion of Hewlett relating to investigations of the solid tin cylinder, finding in it "a clear description of a superconducting memory device * * *." The board agreed with the examiner on the matter of obviousness of the features not shown by Hewlett, referring to the Standard Handbook with respect to the use of a fixed pickup coil in a pulsed field in place of a moving coil in a fixed field.

Here, appellants continue to rely on the aforementioned features held to be obvious by the examiner and board. They also urge that the Hewlett arrangement is not a memory device, having reference to their claims reciting an "information storage device." Appellants further emphasize that their device operates with a magnetic field strength much less than that required to destroy the superconductivity of the film.

The most significant aspect of appellants' invention lies in the concept that, with the film of superconducting material having a thickness of less than 3000 Ångström units and the exciting coil arranged to provide a magnetic field normal to the film, a pulse-generated magnetic field of a strength less than that necessary to destroy the superconductivity of the film can cause lines of flux to penetrate through the film to provide a single effective pulse in the pickup coil. Since a succeeding pulse of current through the exciting coil to produce a field of the same intensity will induce another pulse in the pickup coil only if of opposite polarity to the preceding one, the claimed apparatus constitutes a memory device, which device is operable with low electric currents.

▮ We do not think that either that concept or the apparatus recited in the claims for carrying it out is obvious from the art of record.

More specifically, there is no teaching that the apparatus used in Hewlett in investigating the hollow cylinder, which apparatus constitutes the basic structure on which the rejection is grounded, may be modified in a manner making it suitable for operation as contemplated by appellants. In particular, the walls of the cylinder are of substantial thickness, accurately characterized as bulk material by appellants. We do not think it would be obvious to substitute material of a thickness less than 3000 Ångström units, there being no suggestion of any reason for making such a change.[2] The description of the investigation in Hewlett further does not suggest that the superconductive metal of the cylinder can be penetrated by a magnetic field of less strength than that necessary to destroy superconductivity. Rather, it indicates that the opposite is the case, stating:

> *Where the cylinder was lowered in temperature in the absence of a magnetic field until it became superconducting, and an external field less than the threshold field $H_T$ established, the magnetic field penetrated neither the body of the cylinder nor the cavity in the cylinder.* However, if the external magnetic field imposed on the superconducting cylinder was greater than $H_T$, the superconductivity was destroyed. If the field was reduced in intensity to a value less than $H_T$, the cylinder again became superconducting, the field in the cavity was $H_T$, and the induction in the superconducting regions of the cylinder was zero. Removing the field entirely, keeping $T < T_c$ [critical temperature], produced no change in the induction in the su-

---

2. The board referred to "Digital Computer Design Fundamentals" by Yaohan Chu, McGraw Hill Book Co., 1962, pages 229 and 230, as showing that the "3000 Å [Ångström] thickness is merely a mathematically derived constant recognized as the upper limit for thin film effects * * *." It is not seen how that publication can be relevant here since it is subsequent to appellants' filing date and thus, as conceded by the Solicitor, "is not a prior art reference." Moreover, it is not seen as teaching that a superconducting film less than 3000 Ångströms thick would have the property of permitting penetration by a magnetic field less than the threshold value.

perconducting regions of the cylinder or in the magnetic field inside the cavity of the cylinder. [Emphasis ours.]

The other investigation described in Hewlett, particularly relied on by the board, involved a long solid cylinder of tin subjected to an external magnetic field in the direction of its axis. The external field was increased by steps and increments of induced flux B in the cylinder were measured at each step by means of a test coil. The relationship between the magnetic field H and the induced flux B, when plotted, resulted in a hysteresis curve showing B to lag behind H as the latter was varied between threshold values of opposite polarity for superconductivity, $H_T$ and $-H_T$. The results are described as follows (references to characters on the plotted curve omitted):

* * * the first time the magnetic field is applied, the induction B remains zero until the magnetic field nearly reaches the threshold value $H_T$ * * *. The induction then increases suddenly until $B=H_T$ * * *, as it must when the metal is not superconducting. On decreasing the external field again, there is a sudden drop in B at the same field strength as for the sudden increase, * * *. The induction then decreases gradually, * * * leaving a small amount of induction * * * when H=O. The field H may be reversed and the cycle continued and completed as shown. If the cycle is interrupted, * * * and H increased again, the induction remains constant * * * as long as the field strength does not exceed $H_T$'. It will be noticed that if a field greater than $H_T$ is applied and removed, the induction left in the specimen represents a certain remanent magnetism which persists as long as the metal is kept in the superconducting state.

The board found in the description of that investigation "a recognition that a superconducting material will have remanent magnetic properties even when the field to which it is subjected is less than the threshold flux, * * *." Noting the disclosure that a small increase in field strength at some point along the hysteresis curve to a value less than the threshold value $H_T$ does not alter the magnetization while the application of a field of reverse polarity of magnitude $-H_T$ will cause a reverse magnetization, the board concluded:

* * * we find in the reference a clear description of a superconducting memory device in which either of two stable states of magnetization is achieved and of a procedure for testing the unit for detecting which of the two memory states the device had assumed. * * *

We think it clear the board erred in concluding that there is a description of a memory device in Hewlett. Obviously there is no specific reference to a memory device and the board bases its finding on what it seems to consider implicit in the results of the investigation which provided the information for the hysteresis loop. In the investigation, the magnetic field was varied in small steps rather than applied in the form of pulses as in appellants' device. The Hewlett hysteresis loop investigation indicates that a magnetic field reaching the threshold value in the opposite direction is required to cause a reversal of the remanent magnetic flux in the material. It is not suggested that application to the superconducting material of a pulsed magnetic field which rises to a value less than the threshold value and then falls to zero, as is produced by the application of a small pulse of current in appellants' exciting coil, can provide a single pulse of current in a pickup coil on the other side of the material. Of course, the Hewlett investigation with its solid rod of material, also does not teach that a film of less than 3000 Ångströms thick will provide that result.

The solicitor refers to a portion of the Hewlett article which states that the behavior of alloys relative to superconductivity is more complicated and quite dif-

ferent from that of pure metals. As one characteristic, Hewlett sets out:

(3) The condition B=O is not always satisfied. If a weak magnetic field is applied when the alloy is already in the superconducting state, then $\dfrac{dB}{dt}=0$, but the magnetic field commences to penetrate the metal long before $H_T$ is reached. Complete penetration (H the same within and without the conductor) is approached very gradually and is attained only at $H_T$.

While it is thus stated that penetration by a magnetic field commences at a field strength below the threshold value, there is no disclosure that the amount of penetration might be such as to provide the effect appellants rely on for operation of their device. Moreover, bulk material is involved rather than thin films of the order appellants require. Noting that the examiner and board did not find this portion of Hewlett of such significance as to warrant specific mention, we think it falls far short of making it obvious to apply a pulsed magnetic field of less than threshold value to a thin film of superconducting material to provide a single pulse of current in a pickup coil.

For the foregoing reasons, we do not think that Hewlett would suggest the basic concept of appellants' device. It thus is unnecessary to consider whether the Standard Handbook would make it obvious to conduct Hewlett's investigations with a fixed coil and a pulsed flux instead of a movable coil and a stationary flux. Neither is it necessary to consider the question of obviousness of shielding the pickup coil from flux not penetrating the film.

The solicitor has urged that the designation of the claimed subject matter in the preamble as an "information storage device" is merely a designation of intended use which should not be considered as distinguishing the claimed structure over the references. In support of that contention, he refers to In re Sinex, 309 F.2d 488, 50 CCPA 1004, and cases listed in Appendix "A" to Kropa v. Robie et al., 187 F.2d 150, 38 CCPA 858. While Appendix "A" of the latter case lists previous ex parte cases in which "the preamble [was] held not to express a limitation of the claim," the case includes an Appendix "B" listing cases in which the contrary conclusion was reached. It seems apparent from the decisions on this point, including Sinex, that the significance of the preamble is something to be determined on the basis of the facts of each case. It is unnecessary to discuss the point in detail here since the body of each claim defines novel features which are also unobvious over the prior art of record. Moreover, those features are disclosed as lending particular utility to the structure as such a device.

Since we do not think the claimed invention is obvious under 35 U.S.C. § 103, the decision of the board is reversed.

Reversed.