EUTECTIC CORPORATION, New Metals Corporation and Metallizing Company of America, Inc., Plaintiffs-Appellees and Cross-Appellants,

v.

METCO, INC., Defendant-Appellant and Cross-Appellee.

Nos. 997, 1281, Dockets 76–7490, 76–7514.

United States Court of Appeals, Second Circuit.

Argued May 2, 1977.

Decided Feb. 6, 1978.

Rehearing Denied May 17, 1978.

John M. Calimafde, New York City (Hopgood, Calimafde, Kalil, Blaustein & Lieberman, Eugene J. Kalil and Marvin N. Gordon, New York City, on the brief), for plaintiffs-appellees and cross-appellants.

Arnold Sprung, New York City (Burgess, Dinklage & Sprung, Nathaniel D. Kramer, New York City, on the brief), for defendant-appellant and cross-appellee.

Before TIMBERS and VAN GRAAFEILAND, Circuit Judges, and OWEN, District Judge.*

OWEN, District Judge.

This is an appeal from a determination of the District Court for the Eastern District of New York, reported at 418 F.Supp. 1186 (1976), that certain patents are valid but not infringed. The patents are two and involve the art of spraying various bi-metallic composites from a flame spray gun onto a metal surface, much as paint is sprayed. United States Patent No. 3,322,-515 (the '515 Patent) covers the flame spray materials in powder or wire form.[1] No. 3,436,248 (the '248 Patent) covers the process of spraying the materials described in the '515 Patent.

---

* Of the Southern District of New York sitting by designation.

1. Many different pairings of metals are set forth as achieving the desired self-bonding effect, with varying bonding strengths being achieved by different percentage relationships of the metals.

The patents teach the artisan that various specified pairings of metals (e. g., nickel and aluminum) prepared and sprayed under appropriate circumstances, will cause a firm, self-bonding coating upon an unprepared metal surface. Essential to this result, the patents teach, is the generation of a certain minimum amount of additional heat during the spray flight. This is caused by the two metals—already heated to a reaction point by the flame spray gun—thereafter interreacting to form intermetallic compounds, and, in the process, giving off heat. The artisan, according to the patents, may vary the proportions in the various pairings according to what is desired as the coating, so long as the proportions selected produce the required additional heat in spray flight. There are standard metallurgical diagrams to which an artisan can refer to determine which proportions will produce the required heat and which will not, and the '515 Patent provides some examples.

Only one spray powder, consisting of essentially 95% nickel and 5% aluminum by weight, is involved here because of its substantial commercial success. Each particle of the fine powder has a nickel nucleus surrounded by even finer aluminum particles bound to the nucleus by resin.[2]

Plaintiffs are the claimed infringers. They are the Eutectic Corporation and New Metals Corporation, manufacturers of products in this general field, and Metallizing Company of America, a manufacturer and seller of flame spraying equipment and a purchaser for resale of Eutectic's powders. Plaintiff Eutectic markets flame spraying powders under the trade names "ExoTec," "XuperBond," and "DuroTec." Plaintiff Metallizing markets Eutectic's powder as "Moguloy M–55."

Defendant Metco, Inc. is the owner of the patents in question, and markets its successful "Metco 450" thereunder. It is conceded that the Eutectic and Metallizing powders are nickel-aluminum compositions substantially identical to the "Metco 450" powder.[3]

Plaintiffs in this action sought a declaratory judgment of non-infringement and invalidity of the patents.[4] Defendant Metco counterclaimed, charging infringement by each plaintiff.[5] The District Court found validity, but concluded the patents were not infringed. All parties have appealed.

The history of this field is instructive. Flame spraying of metal onto a metal surface is usually accomplished by placing flame spray material in either rod, wire or powder form into a flame spray gun in which, by gas-oxygen reduction or electric arc flame, it is reduced to a molten or semi-molten state and thereupon propelled onto the surface to be coated. From the turn of the century to the 1940's, the only practicable method of assuring some degree of bonding between the coating and the surface was to mechanically roughen the surface to provide crevices and undercuts into which the sprayed molten particles would enter, forming a mechanical interlock. In the mid–1940's, a substantial advance was achieved when one Arthur P. Shepard, a Metco engineer and deceased co-patentee of the patents in suit, discovered that molybdenum, when used as a flame spraying material, would self-bond on a clean unprepared surface. Shepard was granted a patent thereon.

For the next fifteen years molybdenum wire was the only widely-used material in the flame spray field, notwithstanding a number of disadvantages. It was difficult and messy to use, caused wear on equipment because of its hardness, could only be applied at a relatively slow spray rate,

2. Certain of the powders in suit have small amounts of additives. These additives have no relevance to the issues before us.

3. Obviously, if the District Court's conclusion of non-infringement by the plaintiffs is correct, Metco's own "450" is not within its own patents.

4. This litigation had its beginnings in the Northern District of Illinois in an action by Metco against Metallizing because of the latter's sale of "Moguloy M–55."

5. Jurisdiction is based upon the patent laws of the United States. 28 U.S.C. § 1338.

would not satisfactorily bond to certain surfaces, required a high degree of operator skill, and could not be used where the part being sprayed would subsequently be subjected to use at temperatures above 600 degrees, at which the molybdenum would oxidize and deteriorate, destroying the bond. Thus, there remained during those years a clear need to be filled in the flame spraying art to overcome the problems associated with molybdenum.

As events would have it, this need was also met by a Metco engineer, Ferdinand J. Dittrich, who, working under Shepard, discovered the solution in a powder, each particle having a nickel core surrounded by finely divided aluminum particles bound together by a resin. This powder, when heated to a certain temperature in a flame spray gun, would thereafter exothermically react—that is, each element would chemically react with the other, releasing additional heat during the spray's flight from the tip of the gun to the surface being coated. This heat-creation during flight, Dittrich discovered, would cause a secure bonding even to a smooth, clean, unprepared surface. To phrase it in the approximate language of one of the claims of the '515 Patent, the powder had the ability of generating heat during flame spraying which aided in bonding to the surface being sprayed. Clearly, the key to this generation of heat was to be found in the percentage relationship of the components and the arrangement of each particle.

The plaintiffs, at the outset, attack the District Court's conclusion of patentability. They claim that all the basic elements of the Metco patents are found in the prior art. Clearly, the prior art discloses a number of elements inherent in and essential to the Metco patents such as the principles of exothermic reaction and intermetallic compound formation between certain metals. A 1958 patent to one Mackiw discloses a method of coating particles of one metal with another. Mackiw's object, however, was essentially to develop an improved process for pressing or compacting metal powder into shapes difficult to manufacture by conventional casting methods, and, we note, the powders in suit were the product of Dittrich's specifications, not Mackiw's. A Gutzeit patent (1959) teaches the melting of a nickel-phosphorous composite in a flame spray gun but merely speaks of spraying "the resulting melt" upon a metal surface.

What the prior art does *not* teach is how, with conventional flame spray equipment, a coating can be made to self-bond to a clean, smooth metal surface through the use of starting materials capable of causing an exothermic reaction in the spray stream releasing further heat to aid in the bonding. It is, therefore, the creation of certain additional heat in the spray flight that is unique and is at the heart of Dittrich's invention. Thus, the specific materials and their use as disclosed are clearly a "new and useful . . composition of matter" in their distinctive arrangement, function and end result, and therefore patentable under 35 U.S.C. §§ 101, 102. The conclusion of the court below to this effect was thoroughly supported by the evidence. 418 F.Supp. at 1196–1201.

Plaintiffs next assert the "obviousness" of the alleged invention to defeat the patent. See 35 U.S.C. § 103. The court below, however, put the question well: "Would it have been obvious to those [skilled in the art of flame spraying] that the formation and flame spraying of nickel-aluminum powders as taught in the patents in suit would produce a self-bounding coating on a metal substrate that had not been heated or otherwise treated to receive it?" The court found that it was not, and we agree. After fifteen years of less than satisfactory experience with molybdenum, Dittrich was the first to recognize, develop and adapt the concept of coated or clad powder particles for use in flame spraying to achieve a self-bonded surface coating without prior preparation of the substrate. Further on the question of obviousness, the court below noted that "[t]he overriding purpose sought to be accomplished by the patentees was to develop a flame spray powder that would self-bond as sprayed, as did molybdenum

wire, [and] that would overcome the latter's disadvantages . . . ." That this was in fact accomplished by Metco's powder was shown by its immediate commercial success upon introduction to the trade. During the first year, over 50,000 pounds were sold and eventually it replaced molybdenum wire to a large extent.[6] The court below correctly concluded that the patent flame spray materials constituted a significant, unexpected and unobvious improvement in the art. 418 F.Supp. at 1201–07. This finding is amply supported by the record.

We affirm the well-reasoned determination of the court below that the patents are valid.

We next turn to the District Court's conclusion of non-infringement. The court below held that Metco had not met its burden of proof on the issue of infringement, and this conclusion was clearly based on the court's factual finding that if the flame spray powder contained less than 10% aluminum by weight, there would be no formation of an intermetallic compound as a heat-generating mechanism in accordance with the teaching of the patent. Consequently, the plaintiffs' 5% aluminum powders were necessarily non-infringing.[7]

In reaching this conclusion, the court below recognized, and it is without dispute, that the claimed infringing powders, while having but 5% aluminum, do fall squarely within Claim 14 of the '515 Patent, which reads as follows:

A flame spray powder in the form of individual clad particles comprising a nucleus of nickel and a coating layer of finely divided aluminum particles bound to the nucleus with a binder and characterized by the ability of generating heat during flame spraying which aids in bonding to the surface being sprayed.[8] However, the court, on the basis of certain examples in the '515 Patent [9] and its understanding of the appropriate metallurgy, read into Claim 14 a requirement of at least 10% aluminum by weight. While we agree with the court below that it is appropriate, in certain circumstances, to refer to other portions of the patent to understand and define its boundaries, *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), we disagree with its finding that a minimum of 10% aluminum by weight is required to generate heat by means of an exothermic reaction between the nickel and aluminum in the formation of an intermetallic compound.

Essential to the determination of the necessary percentage of aluminum required for the appropriate production of heat is a certain phase diagram, which read together with an associated graph, shows the amount of heat released by interaction of nickel and aluminum throughout the entire spectrum of percentage relationships, whether stoichiometric [10] or non-stoichiometric. The court below properly found the phase diagram to be one relied on generally by me-

---

6. Commercial success, while not controlling, is an indication of significant and non-obvious improvement in the art. *See International Nickel Co. v. United States,* 175 U.S.P.Q. 209, 213 (Ct.Cl.1972). *See also Maclaren v. B–I–W Group Inc.,* 535 F.2d 1367, 1376 (2d Cir.), *cert. denied,* 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976).

7. In this regard the court took note of some expert testimony that while there would be an exothermic reaction in the spray stream, it would be an oxidation reaction between the aluminum and oxygen in the air, and that only nickel would be deposited on the spray surface.

8. The court below also found the essence of the '515 Patent to be—and there is no question that the alleged infringing powders are—starting materials capable of generating an exothermic reaction releasing heat during the spray

flight to cause a bond upon the receiving surface. We agree with this and also agree that one must focus primarily upon the initial composition of the powders in question rather than upon the composition of the c ..ting after spraying.

9. No examples spoke of less than 10% aluminum, and some spoke of more.

10. "Stoichiometric" is defined as "characterized by or being a chemical composition of definite proportions by weight . . . [or] a proportion of substances or energy exactly right for a specific chemical reaction with no excess of any reactant or product. . . ." Webster's Third New International Dictionary 2248 (1961).

tallurgists, and therefore to govern. However, relying upon an unresponsive and consequently misleading answer of one Dr. Nicholas Grant, an expert for plaintiffs,[11] the court below erroneously concluded from the diagram that a minimum of 10% by weight of aluminum was required for there to be any interaction resulting in the formation of an intermetallic compound releasing the necessary heat. However, examination of the phase diagram itself reveals that there was confusion below between weight and atomic percentages and that, in fact, according to the diagram, such an effect will occur with only 5% aluminum by weight.[12] It is unquestioned that the patents speak in terms of the *weight* of the components, not the atomic percentages. Indeed, at later points in the trial, Dr. Grant conceded that 5% *by weight* according to the phase diagram could not only cause a reaction releasing more than the minimum requirement of heat [13] but also form some intermetallic compound.[14]

■ Unquestionably, when the decision of the court below rests upon an incorrect reading of an undisputed document, this court is free to substitute its own reading of the document. *Orvis v. Higgins,* 180 F.2d 537, 539 (2d Cir.), *cert. denied,* 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950). Upon a thorough consideration of the record, including Dr. Grant's own testimony as to the phase diagram, the conclusion is inescapable that a mistake was made in the District Court's interpretation of this key document, and that the findings and conclusions based upon it are clearly erroneous. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

■ It is also apparent that the court below, in reading a minimum of 10% aluminum into Claim 14 of the '515 Patent from certain examples set forth elsewhere in the patent, was doing no more than finding what it believed to be additional support for the metallurgical conclusion it had mistakenly reached. Since the extent to which a court may look to the specifications or examples to limit the claim is to be determined on the facts in each case, *In re Van Lint,* 354 F.2d 674, 679 (C.C.P.A.1966), in view of what we conclude is the proper

11. "Q. And what percentage of aluminum is necessary according to the phase diagram in order to obtain an intermetallic type reaction? "At least 10 percent, and preferably 15 or more percent if you want to get a significant heat output, due to the formation of an intermetallic exothermic reaction." Joint Appendix at JA 139.

12. The error below stemmed from the fact that the diagram has two scales along the horizontal axis, one at the bottom for atomic percent and one at the top for weight. Ten atomic percent of aluminum (to 90 atomic percent nickel) is slightly less than 5% aluminum by weight.

13. "Q. And so, would you conclude that the—that in this chart the 90 shown, the point 9 shown is the atomic percent? "A. Well, yes, now that we have corroborated this. "Q. Okay, so that it's 5 weight percent—right? "A. We could have saved this had I been told what it was initially, instead of— "Q. All right, so that's 5 weight percent, if we look at the charts below, we will generate 4,000 calories per gram atom, is that correct?

"A. With reference to room temperature, yes, sir." Joint Appendix at JA 272. This testimony is significant in view of the fact that the '515 Patent states that "[t]he components should release [at least] 3,000 calories per gram atom. . . ."

14. "Q. So that according to your opinion, with five percent aluminum on the nickel surface, it is possible for the aluminum to start to react with the surface of the nickel exothermically and form into a metallic compound? "A. Yes, it may form a thin film of it. Yes, sir." Joint Appendix at JA 284. Dr. Grant, plaintiff's expert, then went on to state emphatically that the intermetallic compound thus formed would probably be lost before reaching the surface by reason of the further diffusion of the aluminum, and thus no intermetallic compound would be found in the coating. However, while the '515 Patent envisions that most pairings of metals, regardless of proportions, will deposit an intermetallic coating on the surface, it nowhere asserts that an intermetallic compound must be deposited on the surface; it merely asserts that its formation is the mechanism that generates the required heat.

reading of the crucial phase diagram, it becomes inappropriate to treat the '515 Patent's examples as some evidence of a limitation upon Claim 14.[15]

Given all of the foregoing, we conclude that the patents clearly teach the artisan that a 95% nickel–5% aluminum powder, prepared and sprayed as described, achieves the result the patent envisions.[16] The patents teach the manner of preparation of the powder, they specify the minimum amount of heat that must be generated in flight, and the artisan, by reference to standard metallurgical charts and diagrams, can readily ascertain that a 95%–5% ratio will provide such heat. Thus, the artisan utilizing this ratio will achieve the result the patent teaches. This is unquestioned. Consequently, the plaintiffs' powders consisting essentially of 95% nickel and 5% aluminum are within Claim 14 of the '515 Patent and Claim 4 of the '248 Patent.[17] They are prepared substantially as taught; they generate the requisite heat; and they achieve the same result. They therefore infringe the defendant's patents.

15. Indeed, to the contrary, in one of the affidavits submitted by inventor Dittrich to the Patent Office in connection with his application, he specified combinations of nickel and aluminum in which the percentage of aluminum for a successful bond ran as low as 2.5%. Joint Appendix at E 790.

16. Dr. Grant contended that the required heat was generated either by oxidation of the aluminum or by a solid solution heat effect between the nickel and aluminum, rather than by the formation in some part of an intermetallic compound. Even if he is correct, this would not affect the ultimate disposition of this case, for as was held in Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527 (1911): "[I]f [a patentee] has added a new and valuable article to the world's utilities he is entitled to the rank and protection of an inventor. And how can it take from his merit that he may not know all of the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention, and it is immaterial whether he can stand a successful examination as to the speculative ideas involved. . . . He must, indeed, make such disclosure and description of his invention that it may be put into practice. . . . This satisfies the law, which only re-

The determination of the court below declaring the patent valid is affirmed. The determination of non-infringement and the award of costs to plaintiffs is reversed, and the case remanded for further proceedings not inconsistent with this opinion.

## ON PETITION FOR REHEARING

Plaintiffs-appellees, Eutectic Corporation, et al., petition for rehearing on the ground that this court improperly substituted its own interpretation of the crucial phase diagram for that of the court below. It is claimed that this court not only erred in assuming a competence to interpret this technical document, but also misinterpreted it and reached an erroneous metallurgical conclusion, thus misconstruing the patent claims. However, the phase diagram was not read by the court in the vacuum the petition suggests. The court's reading was in the light of, and credited, petitioner Eutectic's own expert testimony to the effect that with 5% aluminum, some intermetallic compound will be formed, and the requisite heat generated (see opinion, notes 13–14).

quires as a condition of its protection that the world be given something new and that the world be taught how to use it." Id. at 435–36, 31 S.Ct. at 447–48, 55 L.Ed. at 532. Also applicable is Devex Corp. v. General Motors Corp., 467 F.2d 257 (3d Cir. 1972), cert. denied, 411 U.S. 973, 93 S.Ct. 2145, 36 L.Ed.2d 696 (1973). There the defendant sought to avoid infringement by arguing that the chemical interactions that occurred during its accused lubrication process were different from those reported by the patentee. In reversing the lower court's holding of non-infringement, the court ruled: "[I]f it is directly determinable that the two lubricants have essentially the same components, are applied in the same way and that the results of their use are essentially the same, the disputation of chemists about the chemical interactions that occurred in the processes cannot be decisive." Id. at 261.

17. In practice, the precise ratio of the powders doubtless varies by some fraction of a percent. Such variation, however, would not alter the inescapable conclusion that powders in the range of those at issue in this case are within the scope of the patent. See International Nickel Co. v. Ford Motor Co., 166 F.Supp. 551, 558 (S.D.N.Y.1958).

While on this petition for rehearing we need not decide whether it is appropriate to permit the record in this court to be supplemented by the four affidavits of metallurgists annexed to the petition, it is significant that two of them do not deny that there will be at least *some* formation of an intermetallic compound with a 5% aluminum ratio. This is consistent with the said testimony of Eutectic's own expert on the trial (note 14).

Finally, we note that the petition for rehearing in no way contests the court's conclusions that (1) if an artisan studies the phase diagram together with the related heat-release chart[1]—which petitioners do not mention—he can ascertain that 5% aluminum will generate more than the minimum heat that is required, and (2) by using this ratio he will in fact obtain the firm bonding of which the patent speaks.

The petition for rehearing is denied.

1. This diagram and associated chart are set forth hereafter. They are the ones to which Eutectic's expert was referring as quoted in note 13.