Cecil SHACKELTON, Carlos M. Quinones, Vivian M. Williams, Richard H. Williams, Jr., Alfred C. Williams and Raymond A. Williams, Plaintiffs-Appellants-Cross Appellees,

v.

J. KAUFMAN IRON WORKS, INC., and Windor Security Systems, Inc., Defendants-Appellees-Cross Appellants.

Nos. 168, 434, Dockets 81–7319, 81–7347.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1981.

Decided Sept. 14, 1982.

James Reisman, Barry A. Cooper, Rackman & Reisman, New York City, for plaintiffs-appellants-cross appellees.

Robert W. Fiddler, Fiddler & Levine, New York City, for defendants-appellees-cross appellants.

Before WATERMAN, OAKES and MESKILL, Circuit Judges.

WATERMAN, Circuit Judge:

Plaintiffs-appellants [hereinafter plaintiffs or appellants] appeal from a final judgment entered in the United States District Court for the Southern District of New York, after a five day trial before Judge Thomas P. Griesa sitting without a jury. The trial judge dictated his decision, including findings of fact and conclusions of law, and ruled that appellants' patent in suit, No. 3,506,056, issued on April 14, 1970, was invalid for obviousness under 35 U.S.C. § 103. The lower court, having held the patent at issue to be invalid, declined to rule on plaintiffs' cause of action for patent infringement, which cause was dismissed. Defendants-appellees [hereinafter defendants or appellees] cross-appeal from that portion of the judgment which dismissed their counterclaim for breach of contract, which action sought repayment of royalties previously paid under an exclusive licensing agreement.

For the reasons expressed below, we hold the patent valid. Accordingly, the district court's judgment below is reversed and the cause is remanded for a finding as to the issue of infringement. We affirm that part of the lower court's judgment which dismissed the counterclaim for breach of contract.

## I. The "Burglar Proof Window Grill"

Appellants' invention, the patent validity of which is in dispute, is encaptioned a "burglar proof window grill" on the patent. The invention is in the form of a slidable gate which is installed into windows in apartments and other similar residences. The purpose of the grille mechanism is to prevent illegal entry into an apartment through the window while also providing for quick egress in case of an emergency.

The trial judge notes the following background with reference to the need for such a window grille:

For some years prior to the issuance of the patent there had been a problem about security gates placed in buildings, particularly inside of doors and windows opening onto fire escapes. In view of the ever-increasing burglaries in New York City and other metropolitan areas, there was an increasing use of security gates, including gates located in doorways and windows opening onto fire escapes. It appears that most of these gates were locked with padlocks. These padlocked gates were apparently reasonably satisfactory in keeping out burglars, but they had a great disadvantage in hindering the

egress of building occupants at times of emergency, particularly during fires. The record shows vividly that these padlocked gates were responsible for the deaths of many persons because in the panic and confusion attending a fire, the padlocks could not be opened, or the key would be lost, or some other problem would arise which made these padlocked gates barriers to the exit from the fire-stricken structure.

The State of New York responded to the grim problem of people, safe from burglars, but in danger of perishing from smoke and flames by being trapped behind a padlocked burglar-safe window. It prohibited the use of padlocked security gates in fire escape doors and windows. The gates continued to be sold, however, and were particularly popular in crime-ridden areas where occupants attached the devices themselves, in violation of the law. The lower court noted that appellees, long-time manufacturers of security gates and doors, continued to manufacture and sell such padlocked gates knowing that many would be used not for the protection of business store fronts but for apartment use.

In the 1960's New York City officials sought to stimulate ironworking and construction firms to find an alternative to the padlock gate which was resulting in the deaths of many people.

Two firemen, Cecil Shackelton and Richard H. Williams, and a "fire buff," Carlos Quinones, who had first-hand knowledge of the problem, took up the challenge and used their expertise in an attempt to develop a gate whose design characteristics would have the two-fold objective of providing protection against burglars seeking entry from the outside, and of permitting quick egress from the inside in the event of a fire. In 1967 appellants[1] developed the gate which is the basis of the present suit. They filed a patent application May 31, 1967 and began exhibiting their prototype to the New York City Fire Department and other city agencies for approval. At that time the New York Multiple Dwelling Law did

not permit any gates or grilles to be placed in a window leading to a fire escape. Appellants hoped that city approval would pave the way for an amendment to the state law. When appellants' design met with praise from various city agencies, procedures were undertaken to obtain an amendment to section 53 of the New York Multiple Dwelling Law which would permit approved devices. Such an amendment was enacted on March 29, 1968. On July 25, 1968 the New York City Board of Standards and Appeals approved the gate.

In anticipation of such approval appellants in the meantime had approached appellees and had shown them the prototype. Appellees, who had been working on their own design, were favorably impressed by the prototype. Appellees abandoned their own efforts to design a new gate and entered into an exclusive licensing agreement with appellants, which agreement was dated July 21, 1968. The appellee manufacturers agreed to pay the appellant inventors a ten per cent royalty and guaranteed payment of minimum royalties of $20,000 per year. The agreement was to last for the life of any patent which might be granted but could be terminated upon sixty days' written notice by either party. The agreement noted a patent application was pending.

The burglar-proof window grille, as designed by the appellants, was essentially a basic slidable gate, commonly known as a lazy tongs gate, with close mesh grill-work similar to that found on other such security gates. The grille's locking device, however, did not involve a padlock. The gate edge contained two clasps which fitted into a latch post when closed. The latch bar is lowered by a handle which engages and locks the hasp, much like the mechanism of a gymnasium locker. The handle has a cover fitted over it. The close mesh of the gate and the cover over the handle, in conjunction with a plate at the closing edge of the gate, prevents an intruder from reaching in from the outside and opening the closed gate. When someone inside the

1. Williams having deceased, his heirs are appellants here with Shackelton and Quinones.

apartment wishes to open the gate, the cover over the handle is lifted and the handle is raised, thus disengaging the latch bar from the hasps. Once the gate is unlocked it can be slid open, permitting quick exit.

Appellees, in manufacturing the gate, made certain modifications which departed from the prototype given them from the patent application and thus from the design as approved by the Board of Standards and Appeals. The prototype and the patent design used a form of track in the latch post which was intended to guide the latch bar up and down. This involved two leaf springs which were supposed to give the gate a boost when being opened. The prototype and patent design also employed a gate structure which involved welded angle irons at the top and the bottom. The appellees believed in simplifying the product. They eliminated the track as a separate piece and arranged for a simpler manner of latch post guidance. The leaf springs were determined not to be very useful and were eliminated. The appellees also decided that it would be more practical if the top and bottom of the gate structure were to be formed with sheet metal rather than with angle irons.

With these modifications appellees commenced the manufacture and sale of the appellants' basic design and, for four years, paid royalties pursuant to the license agreement. The trial court stated that the evidence presented to it indicated that by 1972 the appellees, faced by costs rising faster than their ability to increase the prices they charged, found the ten per cent royalty too onerous. Appellees attempted to renegotiate the license agreement but failed. In mid-1974, they terminated the agreement.

Appellants claimed below that the appellees infringed the "burglar proof window grille" patent by manufacturing the same gate structure under the name "Protect-A-Gard," and selling the device without payment of royalties, in violation of the appellants' patent rights. Defendants responded by claiming that the patent in question was invalid, and the district court agreed, issuing a declaratory injunction to that effect.

## II. Scope of Review

An initial matter is the scope of our review. This, in turn, hinges upon the nature of the evidence admitted by the district court. Here, aside from the testimony of only two witnesses, plaintiff Shackelton and the defendant's vice-president, David Kaufman, the record is composed of stipulations, exhibits, and the "testimony" of "hypothetical expert witnesses" submitted by both sides. This type of record is as easily examined by this court as by the court below. Though the district court's factfinding will not ordinarily be disturbed absent clear error, here, the record consists of very little testimonial evidence, and so our review of the facts is broadened. *Philip v. Mayer, Rothkopf Industries, Inc.,* 635 F.2d 1056, 1061 (2d Cir. 1980); *Eutectic Corp. v. Metco, Inc.,* 579 F.2d 1, 5 (2d Cir.), *cert. denied,* 439 U.S. 867, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978); *U.S. Philips Corp. v. National Micronetrics, Inc.,* 550 F.2d 716, 719 (2d Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977); *MacLaren v. B–I–W Group, Inc.,* 535 F.2d 1367, 1371 (2d Cir.), *cert. denied,* 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976). Moreover, the district court's rather cursory discussion of the prior art[2] leaves us largely to guess at the process of inference that led to its findings. Accordingly, our deference to those findings is further diminished. *See Russo v. Central School District No. 1,* 469 F.2d 623, 628–30 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973); *see also, Shaw v. E.B. & A.C. Whiting Co.,* 417 F.2d 1097, 1104–05 (2d Cir. 1969), *cert. denied,* 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970).

## III. The Prior Art

In concluding that appellants' patent is invalid the district court relied primarily

---

**2.** The district court's discussion of the prior art occupies only sixteen lines of its decision. T. 559, line 20–T. 560, line 11.

upon several references to the prior art and said that the individual elements of the patent were known in the art of gate-making. The concept of a slidable gate of a lazy tongs variety was said to be an old concept, as indicated by earlier patents for such gates, namely the 1897 Henning patent and the 1919 Griffith patent. The concept of a plate around the lock or the handle of the gate was also known to be an old concept as disclosed by the Griffith patent. The idea of using a latch post and of locking a gate by means of hasps and a latch bar or by means of hasp pins was found to have occurred to others earlier in this century, as seen by the O'Connor patent of 1924 and the Baker patent of 1936. Finally, the concept of putting a cover or box over a lock to prevent intruders from reaching the mechanism was awarded a patent during the late nineteenth century, as disclosed by the Hagee patent of 1892.

The district court stated that, even without reference to the specific patents noted above, it could be said that these concepts were old in origin in the areas of lock-making, gate-making, door-making and in the security device field. This contention, the district judge indicated, was basically conceded by plaintiffs. Plaintiffs, however, contend that given the particular needs which were, and still are, apparent in metropolitan areas, the combination of these different elements into a burglar proof window grille was not obvious and is deserving of patent protection.

## IV. Obviousness

The district court's sole ground for holding appellants' patent invalid was its conclusion that defendants had demonstrated that the subject matter of the patent "would have been obvious to a person having ordinary skill in the art to which the subject matter pertained." The test which was applied by the lower court is based on 35 U.S.C. § 103. The issue in this appeal, then, is whether "the differences between the subject matter sought to be patented [appellants' invention] and the prior art are such that the subject matter as a whole

would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. . . . " 35 U.S.C. § 103.

The ultimate question of obviousness is one of law, and is to be determined after several factual inquiries have been made. *Sakraida v. Ag Pro Inc.*, 425 U.S. 273, 280, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976). As the Supreme Court has stated in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966):

> [1] the scope and content of the prior art are to be determined; [2] differences between the prior art and the claims at issue are to be ascertained; and [3] the level of ordinary skill in the pertinent art resolved. Against this [factual] background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

The crucial question here is whether in light of the prior art, the fabrication of a burglar-proof but fire-safe window gate, by combining concepts found in previously issued patents would have been obvious to a person having ordinary skill in the art. The district court said that, as to this basic question, the matters involved in the patented device would indeed have been obvious at the time the invention was made to a person having ordinary skill in the art. The lower court gave short shrift to the "secondary considerations" of the *Graham* case in resolving the basic issue. It was noted that under case law the emphasis must be on the question of whether the development of the invention was obvious to one having ordinary skill in the art. The district court answered this question and summed up its findings and holding by stating that:

> . . . although plaintiffs came up with an eminently desirable product, one which admirably met both commercial interests

and the public interest, this was something which was done by persons of ordinary skill in the art and it was merely a matter of adapting well-known elements in gate-making and lock-making in a way that did not constitute an unobvious patentable invention.

We disagree.

■■■ The starting point for a court's judgment on the obviousness of a combination patent is to examine the functions of the components in their prior context alongside the functions they perform in their new combination. *Sakraida v. Ag Pro Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976), *citing Great A & P Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). A change of function for a well known element of a combination patent is a benchmark of nonobviousness. *Id.; B.G. Corp. v. Walter Kidde & Co.,* 79 F.2d 20, 22 (2d Cir. 1935).

■■■ The O'Connor and Baker devices, which in combination suggest a vertical post that locks a door with pins descending into receiving slots, have been previously applied to gymnasium and clothes storage lockers. It is true that these devices, which are usually padlocked shut, could be easily opened from the inside while remaining impervious to the outside and so resemble appellants' device in this respect. It is unlikely, however, that it is the function of the O'Connor and Baker devices not only to prevent ingress from without the gym locker, but also to allow egress from within the locker. This conclusion stems from the simple fact that, generally, one cannot fit within a gym locker; thus the need to egress from one is nonexistent. On the other hand, appellants' device fulfills the need for simultaneous imperviousness from the outside and accessibility from the inside. Thus appellants have devised a new function for such latches.

The district court erred in reading the Griffith patent to preempt appellants' use of a metal plate to cover the latch bar handle. The Griffith patent used a metal cover around a gate handle on collapsible lazy tongs gates to protect the hands of persons such as elevator operators from the scissoring of the gate lattice when closed. Appellants' cover only protects the handle on the locking latch bar and it does not even cover the lattice work around the handle on the gate itself. Its function is not to protect the hand of the operator on the inside, but to prevent operation of the gate altogether by someone on the outside.[3]

The Hagee patent for a window shutter-fastener describes a latch on a lever that is screwed into a window shutter. A receiving hook is fastened to the window sill so that the shutter can be closed when the hook and latch are joined. The latch is shielded in a metal housing that is open only on the inside and, as used also in the Griffith patent, the use of a metal plate to cover a latch bar handle, was well-known in the art. Nevertheless, the Hagee patent does not preempt the device in suit, which utilizes a slidable grille in combination with other features, including the use of a metal handle protection unit.

It is by employing these devices previously used on lockers, window shutters, and elevator gates that appellants arrived at a new solution to a new problem. The functions of these devices were radically altered and even in part inverted by application of their functional use in a different field from the fields each had been designed to function in and within which each had functioned. Even if the trial court's assertion that each of the elements cited was already long-known in the art of "gate-making" is correct, here they are put to new functions in a nonobvious manner. As we have frequently pointed out, a mere showing that each element plays its part "is inadequate

---

**3.** The district court's reliance on the Griffith patent is further flawed. The Griffith patent was examined by the Patent Office during the consideration upon the application of the patent in suit. The statutory presumption of a patent's validity, 35 U.S.C. § 282, is "heightened by a showing that the prior art was adequately considered." *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.,* 372 F.2d 263, 268 (2d Cir. 1967).

to demonstrate obviousness when the combination of those pre-existing elements results in novel, unanticipated or long-sought results." *U.S. Philips Corp. v. National Micronetics, Inc.,* 550 F.2d at 723–34, *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977). *See also United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

### V. Supplementary Criteria

■ Not only do we find the record to be barren of evidence that substantiates a claim that appellant's combination is not patentable because of its obviousness, but other evidence—the longstanding need for an innovation like appellants' invention, the attempt and failure of others to satisfy that need, and the outstanding commercial success of the device once marketed—strongly suggests that the combination created by Shackelton and his associates was not a combination obvious to others working in the same field. Each of these factors may guide a court to a finding of nonobviousness. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Eutectic Corp. v. Metco, Inc.,* 579 F.2d 1, 3 (2d Cir.), *cert. denied,* 439 U.S. 867, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978) (long felt need); *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.,* 372 F.2d 263, 269 (2d Cir. 1967); *Reiner v. I. Leon Co.,* 285 F.2d 501, 504 (2d Cir. 1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).[4]

There can be no doubt that the need for an invention like appellants was pronounced and longstanding. As early as 1962, Shackelton was decorated with the Fire Department's Medal of Honor for rescuing two persons from a Bronx fire in which two other persons had perished because they were trapped behind a padlocked window gate. Government memoranda show that citizens, as protection against burglars, had pressured the City for years to permit the installation of the padlocked gates in spite of the fire hazard, and that in 1967 alone Fire Department inspectors had required the removal of more than 6,000 offending bars and gates from fire escape windows. The need for invention was well known not only to the plaintiffs but to the Fire Department, real estate and tenant groups, the hundreds of thousands of New Yorkers who were compelled to hazard their lives to protect their possessions, and to all those who heard the plea for a new invention solicited by the City through radio, television, and news print.

■ Those pleas reached the appellee, Kaufman, a premier manufacturer of security gates, whose press release states that the company had devoted "all its research and development efforts to this new project," but that these efforts were "dropped" when the defendant had an opportunity to enter into the licensing agreement with appellants. Kaufman's failure to develop a solution in answer to the demands for invention is persuasive evidence that the plaintiffs' invention was not obvious to others skilled in the art, *Champion Spark Plug Co., v. Gyromat Corp.,* 603 F.2d 361, 368–72 (2d Cir. 1979), *cert. denied,* 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980), as is, likewise, the failure of others to produce a suitable invention, *U.S. Philips Corp. v. National Micronetics, Inc.,* 550 F.2d 716, 719–23 (2d Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977).

---

4. The supplementary indicia of nonobviousness outlined by the Court in *Graham* are particularly helpful in a case such as this one where the dangers of hindsight are great. These indicia may be the only warning to a judge that he is engaging in backward vision when an invention that seems obvious to him when studied in argumentative context eluded those skilled in the art at the time the invention was created despite a then long-felt need for the invention and the then possibility of significant commercial reward. *Graham, supra,* 383 U.S. at 36, 86 S.Ct. at 703. By tempering the risks of the retrospective treatment of an invention by a reviewing judge with a look at the objective indications of inventive difficulty, the *Graham* supplementary criteria also increase the predictability of patent security, thereby "promoting the useful arts." Moreover, such a judicial approach reduces the likelihood that inventors will choose to protect their creations as trade secrets under state law, thereby making them unavailable to the public domain. *See* 48 Geo. Wash. L. Rev. 110, 117 (1979).

The district court rationalized the defendant's failure and that of others to invent an acceptable solution by stating that the defendant was "geared up for making simpler, less expensive gates and ... did not extend themselves to come up with a new design," and that the effort to seek City approval of a new gate would be too taxing for the project to be worthwhile. This suggestion, is, however, squarely contradicted by the fact: appellants' gate cost little more than the illegal devices manufactured by Kaufman; Kaufman's own press release stated that the company "geared all its research and development" to create a "new product" to meet the City's needs; Kaufman did in fact invent and patent a new fire escape security gate of its own, Patent No. 3,417,805, though, for reasons the record does not expose, Kaufman "chose not to manufacture that one;" and whatever the costs of winning City approval, Kaufman's research drive to develop a legal gate which the City would accept would have been pointless if Kaufman expected never to have the City legalize the fruits of its efforts to meet the City's advertised wants. It is plain that appellants' device answered a long-felt need that others skilled in the art had failed to fulfill, and so it seems beyond question that appellants' invention was not an obvious one.

The commercial success of appellants' device, acknowledged by the district court, and measured by its dominance of the market in fire escape security gates almost to the exclusion of other devices, see 112 U. Pa. L. Rev. 1169, 1175 (1964), cited with approval in Graham v. John Deere Co., supra, 383 U.S. at 18, 36, 86 S.Ct. at 694, 703, is cast in doubt only by Kaufman's assertion that it could not raise prices fast enough to keep pace with production costs and the royalty fees. However, this statement is contradicted by the willingness of another manufacturer, Jay-Bil Industries, Inc., to enter as a *non*-exclusive licensee into the same royalty agreement found too onerous by Kaufman which was enjoying exclusive license.[5]

■ After our examination of the very different functions performed by each of the component parts in appellants' utilization of them in their invention, as well as the failure of others to produce the invention despite the need and incentive to do so, we conclude that, without more, there is no persuasive evidence showing that appellants' combination of previously known components would have been an obvious invention. Appellants' patent is not invalid for obviousness under § 103, and we remand to the district court the issue of Kaufman's infringement of appellants' patent by continuing to manufacture the gate after the license arrangement was terminated in 1974.

## VI. Failure of Consideration

■ The gate Kaufman marketed under the license agreement with appellants used a design differing in a few details from the one for which appellants were ultimately able to obtain a patent. Kaufman argues that there was therefore a failure of consideration under the license agreement and that Kaufman is entitled to restitution of royalties paid until mid-1974 to appellants. The district court properly dismissed this claim. The licensing agreement granted Kaufman

... the exclusive right, license and privilege to make, have made, use and sell window guards (hereinafter called "Licensed articles") embodying the invention, and any and all of the features thereof, described and claimed in the patent application, *in any patents which may issue pursuant thereto,* and in any application and patent for any improvements thereon.... (emphasis added).

---

**5.** In addition to a finding that a plaintiff's invention is a commercially successful solution to a long-felt problem that others have failed to solve, the nonobviousness of appellants' invention is also indicated by the approval that its competitors and other qualified observers gave the device. E. 28-30 (Kaufman's press release); E. 23 (New York Times article 6/1/67);

E. 20 (letter of Bruce J. Gould, Deputy General Counsel of Housing and Development Administration); E. 21 (Recommendations of New York City Board of Standards and Appeals; *see United States v. Adams, supra,* 383 U.S. 39, 52, 86 S.Ct. 708, 714, 15 L.Ed.2d 572 (1966); 112 U. Pa. L. Rev., *supra* at 1182.

Kaufman received no less than that for which it contracted, and is liable for royalties under the agreement even though the final patent was somewhat narrower than the original application. *See Swan Carburetor Co. v. General Motors Corp.*, 42 F.2d 452, 454 (N.D. Ohio 1927), *aff'd, Gen. Motors Corp. v. Swan Carburetor Co.*, 44 F.2d 24 (6th Cir. 1930), *cert. denied*, 282 U.S. 897, 51 S.Ct. 181, 75 L.Ed. 790 (1931).

Furthermore, it is not clear what benefit Kaufman sought from the licensing agreement that it was denied by the narrow patent. The district court rejected Kaufman's claim as it found that Kaufman used and enjoyed the benefit of the patent notation on the labels and in its advertising of the gates it marketed. Any representation by Kaufman that the patent did not exclude potential competitors from reproducing the gate as manufactured and hence that Kaufman enjoyed less of a share of the market than Kaufman had bargained for is wholly undermined by the evidence that appellants' gate overwhelmingly dominated the market.

The judgment below is reversed in part and the cause is remanded for consideration of the infringement issue.